## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

JANE DOE,

                                    Plaintiff,

v.

SARAH LAWRENCE COLLEGE,
CRISTLE COLLINS JUDD,
ALLEN GREEN,
DANIEL TRUJILLO,
PAIGE CRANDALL, and
BEVERLY FOX

                                    Defendants.

_____

Civ. No.  **7:19-cv-10028**

**COMPLAINT**

Jury Trial Demanded

Plaintiff Jane Doe ("Jane"), by and through her attorneys of record Marsh Law Firm

PLLC, alleges for her complaint as follows:

### PRELIMINARY STATEMENT

1.      This is an action against the Defendant for discrimination on the basis of sex and

retaliation in violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C.

1681 and related state claims.

### PARTIES

2.      Plaintiff Jane resides in Dallas, Texas.

3.      Defendant Sarah Lawrence College ("SLC" or "College") is a private college

located in Bronxville, New York.

4.      Defendant Cristle Collins Judd is the President of SLC and resides in New York.

5.      At all relevant times, Defendant Allen Green was the Dean of Equity and

Inclusion and Title IX Coordinator at SLC and resides in New York.

6.      Defendant Daniel Trujillo is the Dean of Students at SLC and resides in New York.

7.      Defendant Paige Crandall is the Dean of Student Affairs at SLC and resides in New York.

8.      Defendant Beverly Fox is the Associate Dean of Studies at SLC and resides in New York.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the Plaintiff's New York state law claims pursuant to 28 U.S.C. § 1367, as those claims are related to their federal law claims that they form part of the same case or controversy.

10.      Venue is proper within this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), because the Defendant is located in New York and the conduct underlying the Plaintiff's claims occurred in New York.

## PLAINTIFFS MOTION FOR PERMISSION TO PROCEED USING A PSEUDONYM

11.      Jane has filed this complaint using a pseudonym in accordance with the applicable law in this Circuit.

12.      Concomitant with the filing of this complaint, Jane filed a motion for permission to proceed using pseudonym.

## SUMMARY OF THE FACTS

### Governing Statutes and Policies

13.       SLC's Student Handbook includes sections on "Policy on Sexual Harassment, Sexual Assault, Domestic Violence, Dating Violence and Stalking" and "Addressing Formal

2

Complaints Against Students for Sexual Harassment, Sexual Assault, Domestic Violence, Dating Violence, and Stalking." *Sarah Lawrence College Student Handbook* 2017-2018, pp. 153-186 [hereinafter "SLC Policy"]. These sections outline SLC's policies, procedures, and rules relating to sexual harassment and assault of students. *Id.*

14.    Defendants and their respective policies and procedures are also subject to Article 129-B of the New York Education Law.

15.    N.Y. Educ. Law 6443 provides all students the right to,

1.    Make a report to local law enforcement and/or state police;
2.    Have disclosures of domestic violence, dating violence, stalking, and sexual assault treated seriously;
3.    Make a decision about whether or not to disclose a crime or violation and participate in the judicial or conduct process and/or criminal justice process free from pressure by the institution;
4.    Participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard;
5.    Be treated with dignity and to receive from the institution courteous, fair, and respectful health care and counseling services, where available;
6.    Be free from any suggestion that the reporting individual is at fault when these crimes and violations are committed, or should have acted in a different manner to avoid such crimes or violations;
7.    Describe the incident to as few institution representatives as practicable and not be required to unnecessarily repeat a description of the incident;
8.    Be protected from retaliation by the institution, any student, the accused and/or the respondent, and/or their friends, family and acquaintances within the jurisdiction of the institution.

16.    N.Y. Educ. Law 6444(4)(h) provides a right to interim measures and states:

To obtain reasonable and available interim measures and accommodations that effect a change in academic, housing, employment, transportation or other applicable arrangements in order to help ensure safety, prevent retaliation and avoid an ongoing hostile environment, consistent with the institution's policies and procedures.

17.    N.Y. Educ. Law 6444(5)(c) provides every student the following rights during the hearing process:

(…)

ii.    To a prompt response to any complaint and to have the complaint investigated and adjudicated in an impartial, timely, and thorough manner by individuals who receive annual training in conducting investigations of sexual violence, the effects of trauma, impartiality, the rights of the respondent, including the right to a presumption that the respondent is "not responsible" until a finding of responsibility is made pursuant to the provisions of this article and the institution's policies and procedures, and other issues including, but not limited to domestic violence, dating violence, stalking or sexual assault.

iii.    To an investigation and process that is fair, impartial and provides a meaningful opportunity to be heard, and that is not conducted by individuals with a conflict of interest.

(…)

**Jane is Sexually Assaulted in a SLC Dormitory**

18.    On Friday, October 6, 2017, Jane was sexually assaulted by fellow SLC student on SLC's campus.

19.    On the evening of the assault, Jane attended a party at the alleged perpetrator's ("Robert's") apartment which was located two floors above Jane's apartment in SLC's Hill House residence hall.

20.    Robert gave Jane what she believed to be a shot of vodka in a cup after which she became severely intoxicated and suffered from almost immediate memory loss.

21.    Shortly after drinking from the cup, Jane went with several students, including Robert, to a second party at another SLC residence hall, Slonim.

22.    When she awoke the next morning, Jane had an incomplete memory of the night before but assumed she returned to her room after the party at Slonim.

23.    Later that morning, Robert sent Jane a message on Snapchat stating that he found her earring in his room.

24.    Jane assumed her earring must have fallen off at some point during the first party at Robert's apartment.

25.     When Robert arrived at Jane's room to return her earring, he asked Jane if she was on birth control.

26.     While Jane was surprised that Robert had asked her such a personal question, she was shocked when Robert informed her that he "used a condom."

27.     Jane had no memory of any sexual contact with Robert and was concerned that he had drugged the drink he gave her in order to sexually assault her.

28.     Jane was previously aware of rumors around campus that Robert had a reputation for drugging female students in order to engage in sexual activity with them.

**Jane's Prompt Report of Sexual Assault to SLC's Title IX Office;**
**SLC's Complete Disregard of Jane's Request for Confidentiality and Concerns Regarding**
**Retaliation; and Robert's Title IX Retaliation against Jane**

29.     On Monday, October 9, 2017, Jane met with the SLC Dean of Equity and Inclusion and Title IX Coordinator Allen Green [hereinafter "Dean Green"] and SLC Title IX Investigator Caressa Nguyen [hereinafter "Investigator Nguyen"] and reported that she was sexually assaulted on SLC's campus by an SLC student.

30.     Another student and friend of Jane's attended the meeting with her for support.

31.     During the meeting, Dean Green informed Jane that he and Investigator Nguyen would investigate the matter and possibly take additional measures such as moving Robert's housing.

32.     The meeting felt rushed and disorganized to Jane. Dean Green and Investigator Nguyen did not formally document the meeting and took notes that were less than one page long.

33.     Dean Green asked Jane if she was interested in a No Contact Order.

34.     Jane responded and explained to Dean Green and Investigator Nguyen that she did not want a No Contact Order because she was afraid that Robert would retaliate against her.

35.     Dean Green and Investigator Nguyen failed to inform Jane that under Title IX and SLC Policy she was protected from retaliation.

36.     SLC Policy states:

> The College does not tolerate retaliation or discrimination against any person and/or their family and friends, who brings forward a report, who cooperates in the investigation of a report, or who participates in the discipline process for an alleged violation of the sexual harassment, sexual assault, domestic violence, dating violence and Stalking Policy. *SLC Policy* at 175.

37.     Dean Green and Investigator Nguyen did not explain that Jane's request for confidentiality could impact their ability to investigate.

38.     When Jane and her friend left the meeting, Jane believed that SLC would investigate her sexual assault and take prompt action.

39.     Jane later texted her friend who confirmed that he believed that Jane had made a "formal" complaint.

40.     Despite Jane's request for confidentiality and her clearly expressed fears about retaliation for making a complaint under Title IX, Dean Green immediately informed Robert of Jane's allegations, including the allegation that Robert had drugged her drink.

41.     Upon information and belief, Dean Green failed to inform Robert that he was prohibited from retaliating against Jane for making the complaint.

42.     Robert immediately tried to intimidate Jane by calling her phone multiple times and texting her.

43.     Robert also retaliated against Jane by telling several SLC students that Jane was making false allegations against him causing significant damage to her reputation at SLC.

44.     Dean Green, Investigator Nguyen, and Robert's actions caused the hostile environment experienced by Jane at SLC to worsen.

**Jane's Experience of Title IX Retaliation Causes Her to Miss Classes;
Jane's Mother Shares Concerns with SLC;
Jane's Advisor is Ignorant of Title IX**

45.     After the sexual assault, Jane was afraid that she would encounter Robert on campus especially since Robert still lived in Jane's dorm and had retaliated against her several times.

46.     Due to her well-founded fears of ongoing retaliation, Jane isolated herself in her room and fell behind in her classes. She was extremely depressed and scared. She did not feel safe on campus.

47.     On October 9, 2017, Jane's mother, Tracy Doe [hereinafter "Tracy"], emailed SLC Faculty Member and Physics Professor Meredith Frey [hereinafter "Professor Frey"] to express concern about several of Jane's missed assignments and unexcused absences.

48.     At the time, Tracy was unaware that her daughter had been sexually assaulted.

49.     Professor Frey assured Tracy that Jane must have confused her class schedule and that Tracy should not be concerned.

50.     Professor Frey also explained, "[i]f [Jane] continues missing work, then I will talk to her don, who meets with her weekly and can provide her with academic advise [*sic*] and let her know about the available resources on campus to help her complete her work."

51.     Jane's "don"[1] was Professor Daniel King [hereinafter "Professor King"].

52.     On or about October 20, 2017, Professor King confronted Jane about missed classes and assignments.

53.     Jane informed Professor King that she was struggling because she was dealing with a Title IX matter.

---

[1] SLC students are assigned a faculty adviser or "don." *See* https://www.sarahlawrence.edu/about/

54.     Professor King asked what Title IX had to do with missing classes and erroneously informed Jane that Title IX only dealt with sports.

55.     After Professor King searched online while Jane waited, he stated he had another student who had a similar experience at SLC.

56.     Professor King was completely unaware of the protections provided to victims of sexual assault on campus and SLC's responsibilities under Title IX.

57.     Professor King did not offer Jane any assistance, academic advice, or a list of available resources on campus.

58.     On October 20, 2017, Investigator Nguyen emailed Jane and wrote:

> […] As part of the schools responsibilities, we wanted to touch base with you again to see how you are fairing. I know you had spoken to Dean Green about resources on-campus, such as utilizing Heath & Wellness or helping you take on a reduced course load of classes. Did you want us to help you with either option? **Due to the circumstances, if you are thinking of taking a reduced course load, it will not reflect negatively on your grades or academic standing at the college**. […]. (emphasis added)

59.     Jane responded to Investigator Nguyen asking,

> What would a reduced course load look like? I think that might be a good option for me but as I am on the pre-health track I don't want to fall behind. Can I come discuss today?

60.     The following day, October 25, 2017, Jane shared her hope with Investigator Nguyen that she could catch up with her studies without a reduced course load and asked if there was a "halfway point" to which Nguyen responded

> The sooner you let us know the better. I'm uncertain if there is a deadline per say but it may not be able to put in place if say there are only a few weeks left in the semester. If you coordinate with us now we can ensure that your 4-year plan allows you to stay on track for pre-health

61.     On October 26, 2017, Jane emailed Investigator Nguyen and explained,

> I haven't made a for sure decision on the subject yet, I have one more
> professor I need to discuss the matter with regarding my makeup work and
> I have a lab with him today from 2-7 […]

62.     Later that day, Jane met with Investigator Nguyen and SLC Dean of Students Dan Trujillo [hereinafter "Dean Trujillo"] who assured Jane that she should focus on her mental health and not worry about being behind in her classwork.

63.     Dean Trujillo never informed Jane that her status with SLC could be jeopardized or how to avoid adverse academic actions.

64.     Jane left the meeting with the understanding that her academic standing with the college was not a factor since she was still recovering as a victim of sexual assault.

65.     Jane also scheduled an intake with SLC mental health counseling for November 3, 2017.

66.     On October 30, 2017, Jane emailed Investigator Nguyen requesting that she contact Jane's professor and let the professor know that Jane had an approved absence to attend a therapy session.

67.     On October 31, 2017, Investigator Nguyen responded that she would email Jane's professor.

68.     After attending the SLC counseling intake session, Jane scheduled a follow-up counseling appointment for November 16, 2017.

**SLC's Severe and Shocking Title IX Retaliation;**
**SLC's Refusal to Provide Accommodations or Interim Measures;**
**Jane is Forced to take Involuntary Medical Leave**

69.     On November 4, 2017, Tracy emailed Dean of Student Affairs Paige Crandall [hereinafter "Dean Crandall"] and SLC Associate Dean of Studies Beverly Fox [hereinafter "Dean Fox"] and shared her concern that Jane was "struggling with her academics."

70.     Dean Fox reports directly to Dean Trujillo.

71.     In the email, Tracy noted Jane's absences, failing grades, and missing assignments since October 9, 2017.

72.     Tracy alerted Dean Crandall and Dean Fox that she had raised these same concerns with Professor Frey on October 9, 2017.

73.     Tracy professed, "I was under the impression that her weekly meetings with her Donn [*sic*] would address this behavior. Is my understanding of the Donn's [*sic*] roll incorrect?"

74.     On November 6, 2017, Dean Fox and Tracy spoke on the phone about these concerns.

75.     Dean Fox did not share information regarding Jane's Title IX complaint and instead suggested to Tracy that Jane was being lazy and not participating in academics at SLC.

76.     Dean Fox incorrectly proclaimed to Tracy that during Jane's meeting with Dean Trujillo on October 26th Dean Trujillo had "laid down the law" and told Jane that she must get caught up with her school work or face suspension.

77.     Dean Fox did not explain to Tracy what resources were available at SLC for Jane to prevent this from happening.

78.     Later that day, Dean Fox sent a letter to Jane accusing her of being only a "resident" instead of a student and demanded that Jane meet with her the next day.

79.     Dean Fox sent the same letter to Tracy and included "…Dean Paige Crandall has outlined how we will follow up…"

80.     The letter from Dean Fox failed to offer services, support, academic resources, or interim measures.

81.    The letter from Dean Fox failed to even acknowledge that Jane was a victim of sexual assault and that possible interim measures included academic accommodations.

82.    Specifically, Dean Fox's letter failed to acknowledge or provide interim measures as outlined in SLC Policy.

83.    SLC Policy states:

> At the victim's request, and to the extent of the victim's cooperation and consent, the Title IX Coordinator will work cooperatively to assist the victim in obtaining accommodations. If reasonably available, a victim may be offered changes to academic, living, working or transportation situations or other applicable arrangements regardless of whether the victim chooses to report the crime to campus police or local law enforcement, in order to help ensure safety, prevent retaliation and avoid an ongoing hostile environment. Examples of options for a potential change to the academic situation may be to transfer to a different section of a class, reduced course load, withdraw and take a class at another time if there is no option for moving to a different section, etc. Potential changes to living situations may include moving to a different room or residence hall. Possible changes to work situations may include changing working hours. Possible changes in transportation may include having the student or employee park in a different location, assisting the student or employee with a safety escort, etc. Both the accused or respondent and the reporting individual shall, upon request and consistent with the College's policies and procedures, be afforded a prompt review, reasonable under the circumstances, of the need for and terms of any such interim measure and accommodation that directly affects him or her, and shall be allowed to submit evidence in support of his or her request. *SLC Policy* at 164-165.

84.    On November 7, 2017, Jane met with Dean Fox.

85.    Dean Fox informed Jane that she was too far behind in her classes and would likely be suspended.

86.    When Jane explained that she was experiencing academic difficulties because she was sexually assaulted on campus, Dean Fox curtly proclaimed that her sexual assault was not a factor which could be considered. Jane was confused and concerned since just a few days earlier Dean Trujillo had assured her otherwise.

87.    On November 8, 2017, Jane had a second meeting with Dean Fox.

88.     During the second meeting, Dean Fox informed Jane that there was no chance for her to remain a student at SLC.

89.     Dean Fox stated that she spoke with Jane's course faculty and each instructor refused to allow Jane to continue as a student because of her missed classes.

90.     During this meeting, which was less than one month after Jane reported being sexually assaulted on campus, Dean Fox told Jane that she needed to make travel arrangements and leave campus within 48 hours.

91.      Dean Fox did not offer any interim measures or accommodations that would allow Jane to continue with her education.

92.     On November 9, 2017, Tracy spoke with Dean Fox on the phone to discuss the precipitous turn of events and learned for the first time that Jane could request a medical leave.

93.     Dean Fox emphasized to Tracy that if Jane did not submit the necessary paperwork within 24 hours that she would be automatically suspended.

94.     Jane was completely unaware of the the medical leave option. No one at SLC had presented this as a possibility.

95.     After the troubling call with Dean Fox, Tracy emailed SLC President Cristle Collins Judd [hereinafter "President Judd"] to express her concern that Jane was being forced to sign medical leave paperwork and leave SLC within 48 hours.

96.     President Judd blamed Jane and failed to offer any interim measures or accommodations that would allow Jane to continue with her education.

97.     President Judd informed Tracy that Dean Trujillo and Dean Fox would follow up to schedule a call.

98.     On November 10, 2017, Dean Fox emailed Jane and Tracy and declared that Jane was required to meet with SLC Director of Counseling and Psychological Services Dina Nunziato [hereinafter "Counseling Director Nunziato"] that same day to complete the medical leave paperwork.

99.     Jane immediately met with Counseling Director Nunziato and explained that she was being forced to leave SLC.

100.     Counseling Director Nunziato expressed shock and concern that Jane was being treated this way after reporting sexual assault.Counseling Director Nunziato immediately contacted Dean Fox to explore alternatives that would allow Jane to continue with her education at SLC. Dean Fox insisted that it was too late and that Jane must leave SLC.

101.     Jane was provided no accommodations or interim measures that would allow her to stay at SLC.

102.     On November 13, 2017, Jane met with Dean Trujillo.

103.     Dean Trujillo informed Jane that although it was unlikely, she may be permitted to stay at SLC if she contacted her course faculty, apologized for not attending class, and explained why she had been absent during the previous two weeks.

104.     Based on her conversation with Dean Trujillo, Jane believed that she was expected to explain the details of her sexual assault and beg her teachers to allow her to remain at the college.

105.     At this point, Jane had not shared the details of her sexual assault with anyone other than two of her close friends, Title IX staff, and counselor at SLC. She did not feel comfortable or mentally prepared to share these intimate and traumatic details of her sexual assault with her SLC course faculty.

106.     Jane was informed by Dean Trujillo that she had until 5:00 p.m. the following day to sign and submit the medical leave paperwork or she would be suspended.

107.     Once again, at no time did SLC offer interim measures or any accommodations which would allow Jane to safely remain at the college.

108.     On November 13, 2017, Dean Trujillo emailed Tracy and explained that Jane was being forced to either take medical leave or be suspended because she had missed "two weeks" of classes and was not in communication with her course faculty.

109.     Dean Trujillo failed to explain that Jane had only started missing classes after being sexually assaulted on campus and that Jane had actively communicated with Dean Trujillo's and Investigator Nguyen in an attempt to maintain her academic standing.

110.     On November 14, 2017, Jane signed and submitted the medical leave paperwork to Dean Trujillo.

111.     From November 15 to November 21, 2017, Jane received several communications from SLC concerning her departure plan. Jane was informed by SLC that she needed to leave campus immediately.

112.     On the early afternoon of November 21, 2017, Assistant Director of Resident Life Erica Monnin [hereinafter "Assistant Director Monnin"] entered Jane's room and pressured her to pack faster so she could leave campus by 8:00 p.m.

113.     When Tracy emailed Assistant Director Monnin at 4:30 to check on Jane, she refused and proclaimed that she had left campus and was taking her dog to be boarded.

114.     After Assistant Director Monnin left Jane's room, Jane continued packing and became depressed and despondent.

115. Later that afternoon, Jane attempted suicide by hanging herself on the shower head in her bathroom.

116. When Jane's boyfriend found Jane hanging from the shower head, he untied her and called SLC for help.

117. When SLC was alerted about Jane's attempted suicide, they sent over a graduate student to monitor Jane until the ambulance arrived.

118. SLC failed to send any type of support person from Counseling and Psychological Services.

119. Even though Tracy was listed as Jane's emergency contact, SLC did not contact Tracy to inform her about her daughter's suicide attempt.

120. After Tracy was alerted to Jane's suicide attempt by Jane's boyfriend, she repeatedly called SLC for information regarding her daughter's safety.

121. When she was finally connected to a security guard, Tracy pleaded with the guard to check on Jane.

122. The guard reluctantly stated that he would check on Jane's status and call her back.

123. When the security guard arrived in Jane's room, Jane requested that she be transported to New York Presbyterian's Westchester Division because they had a program for college students and offered religious services.

124. The security guard refused Jane's request and informed her that she would be transported to New York Presbyterian's Lawrence Hospital because of SLC's relationship with that facility.

125.    When Jane arrived at New York Presbyterian Lawrence Hospital, she requested to be transferred to New York Presbyterian's Westchester Division.

126.    The transfer took many hours and Jane was forced to remain in the emergency room on suicide watch until 2:00 a.m. when she was finally transported to New York Presbyterian's Westchester Division where she remained for 13 days.

127.    When Tracy did not hear back from the first security guard for over an hour, she repeatedly called SLC security, but no one answered the phone.

128.    Eventually, after several more calls, a second guard picked up the phone and stated "oh, I forgot to call."

129.    The second guard informed Tracy that an ambulance had picked Jane up about forty-five minutes prior. The guard did not provide any information regarding which hospital Jane was taken to.

130.    Tracy only located Jane after calling several emergency rooms.

**Despite a Prompt Report of Sexual Assault, SLC Failed to Conduct an
Adequate, Reliable, Impartial, and Timely Investigation;
SLC Admits a Lack of Title IX Training and Proper Notice of Grievance Procedures**

131.    On November 30, 2017, Jane's mother Tracy contacted SLC President Cristle Collins Judd [hereinafter "President Judd"] regarding the status of the Title IX investigation.

132.    On December 1, 2017, Tracy was informed that President Judd was traveling and would not return until December 4, 2017.

133.    On December 5, 2017, President Judd informed Tracy that she was "looking into this troubling situation."

134.    Later that same day, President Judd announced that she could not discuss the situation with Tracy and that Dean Green would contact her.

135.    On December 6, 2017, Dean Green emailed Tracy and stated "[Jane] did not want to file a formal complaint and she did not want any interim measures taken."

136.    When Tracy informed Jane of this response, Jane was shocked and incredibly upset. This was the first time that Jane had any indication from SLC that the college was not investigating and had not investigated her Title IX complaint.

137.    SLC's failure to act was in violation of SLC Policy.

138.    SLC Policy states:

> Upon receipt of a formal complaint of an alleged incident of sexual harassment, sexual assault, domestic violence, dating violence and stalking, the College will promptly investigate and may pursue disciplinary action. *SLC Policy* at 179.

139.    Jane told her mother that she did lodge a formal Title IX complaint and that her friend who accompanied her to the meeting believed she did as well.

140.    On December 12, 2017, Tracy and Jane contacted Dean Green to find out why SLC was refusing the investigate Jane's October 9, 2017 Title IX complaint.

141.    During this call, Dean Green disclosed that he had not taken any action to investigate Jane's Title IX complaint.

142.    For the first time, Dean Green informed Jane that he was not investigating and failed to investigate because Jane had not filed a "formal" complaint. Jane had no idea that her initial complaint was not a "formal complaint."

143.    The official SLC paperwork Dean Green provided at the October 9, 2017 meeting with Jane, entitled "Knowing your Options," did not contain any reference to any requirement that a so-called "formal complaint" had to be submitted in writing, nor did it provide instructions on how to do so. The SLC website also failed to address the requirement of a "formal complaint."

144.    Jane immediately requested that her initial report be considered a "formal Title IX complaint" and that SLC begin immediately investigating her sexual assault.

145.    Additionally, during the call, Tracy and Jane informed Dean Green that when Jane notified her advisor that she was sexually assaulted, Professor King, was completely unaware that Title IX included protections for victims of sexual assault.

146.    Dean Green was unsurprised that SLC faculty were ignorant of Title IX and SLC grievance procedures and protections for students under Title IX.

147.    Dean Green replied to Tracy and stated, "[u]nfortunately our faculty don't pay attention to the work I do or we do on campus. I heard that and had to clarify it for him [Professor King]."

**SLC's Failure to Conduct a Prompt Investigation was Biased Towards Jane and Allowed Robert to Withdraw Without Sanctions or a Notation on his Transcript in Violation of SLC Policy and New York Law**

148.    Jane later discovered that after Dean Green alerted Robert about Jane's allegations, Robert withdrew from SLC and transferred to a different school with Dean Green's advice and assistance.

149.    When Jane asked Investigator Nguyen if a notation was placed on Robert's transcript prior to Robert withdrawing as required by SLC policy and New York state law, Investigator Nguyen admitted that it was not.

150.    SLC policy states:

> For the respondent or student accused who withdraws from the College or takes a leave of absence while an investigation is occurring or conduct charges are pending and declines to complete the conduct process, the College will make the following notation on that student's transcript "withdrew with conduct charges pending" or "Leave of absence with conduct charges pending."

*SLC Policy* at 178.

151.    Further, New York law requires,

> For the respondent who withdraws from the institution while such conduct
> charges are pending, and declines to complete the disciplinary process,
> institutions shall make a notation on the transcript of such students that
> they "withdrew with conduct charges pending."

N.Y. Educ. Law 6444.

152.    SLC's failure to investigate and/or its coverup of Jane's initial report allowed

Robert to evade the required notation on his transcript and permitted him to withdraw from SLC

with no real consequences.

153.    Since Robert is no longer a student, SLC sanctions such as suspension or

expulsion are no longer available.

154.    The only recourse SLC can apply is a retroactive notation on Robert's transcript

which is essentially worthless since Robert has already enrolled in a new school.

155.    Dean Green's quick notice to Robert, his advice and assistance, and his refusal to

conduct a prompt and unbiased investigation was discriminatory and retaliatory towards Jane.

156.    On December 12, 2017, Jane emailed Dean Trujillo and asked whether she could

receive partial credit as described in the SLC student handbook. She stated:

> I have just come home from the hospital and as I am returning my
> attention to external concerns, I have reviewed the SLC student handbook
> regarding partial credit. I can see that partial credit may be awarded to
> students such as myself who haven't completed the academic year. I
> would like to obtain partial credit for the three courses I was enrolled in.
> My academic record is important to me, and I am eager to do whatever it
> takes to maintain a good academic standing in the wake of recent events.
> Can you please guide me on what is required and who I need to work with
> to achieve these partial credits? Any advice you can offer would be of
> great help.

157.    When Jane received no response, Tracy followed up by email to Dean Trujillo

and stated,

Below is an email my daughter, [Jane] sent to you last Sunday. She has yet to receive a response from you. She is clearly anxious to do the work to acquire partial credit."

158.    Again, Dean Trujillo failed to respond which is further evidence of SLC's continued retaliation against Jane.

159.    Dean Trujillo ultimately refused to award partial credit despite a provision in the Student Handbook which allows it.

160.    The clear unwillingness by SLC to even respond to Jane's legitimate requests made it apparent to Jane that she was not welcome at SLC.

161.    SLC refused to take any action to reduce or eliminate the hostile environment which Jane experienced or offer interim measures so she could continue her education that was abruptly halted because she experienced and reported a sexual assault on SLC's campus.

162.    Despite the fact that she did not receive any credit and was prohibited from completing her first semester at SLC, Jane was still required to pay full tuition.

**SLC's Failure to Interview Witnesses and Collect Evidence in a Prompt Manner Caused Significant Bias against Jane**

163.    Despite Jane's request on December 12, 2017 that SLC investigate immediately, SLC again delayed and failed to interview any witnesses for over a month, until January 2018.

164.    At this point, over three months had passed since the night of the assault and evidence that SLC could have collected had they taken prompt and reasonable action after Jane's initial report (such as recovering the drinking cup Robert gave Jane) was no longer available. Additionally, neither Jane nor Robert were on campus.

165.    Further, since Dean Green warned Robert about Jane's allegations in early October, Robert not only had the ability to withdraw from SLC but also had ample time to coach numerous witnesses about Jane's allegations against him.

166.     Many witnesses confirmed during the investigation and hearing process that by the time they were interviewed by SLC's Title IX office, Robert had already spoken with them multiple times concerning Jane's allegations.

167.     Witness 3, one of Robert's roommates, admitted that based on conversations with Robert, he felt pressure to defend Robert against allegations that Robert had drugged Jane's drink.

168.     Witness 5, another of Robert's roommates, who Robert spoke with about the allegations prior to his Title IX interview, reported that Robert did not drug Jane even though he admitted that he did not observe Robert and Jane drinking together that night.

169.     Dean Green's failure to investigate and interview these witnesses and others before Robert had an opportunity to discuss the allegations against him and request their support was biased and discriminatory towards Jane.

**SLC's Investigation Packet was Prejudicial Towards Jane**

170.     On February 12, 2018, SLC completed its investigation and Dean Crandall provided Jane with a copy of the First Investigation Report [hereinafter "FIR"].

171.     Jane was informed that she had until February 22, 2018 to review and submit any new information or materials.

172.     On February 20, 2018, Jane's legal counsel emailed Dean Paige Crandall [hereinafter "Dean Crandall"] to highlight two serious errors in the report.

173.     First, the FIR declared that Jane's belief that Robert sexually assaulted was based solely on her "lack of memory."

21

174.    This conclusory statement was incomplete, and Jane requested that more detail be included in order to accurately reflect what she experienced and reported to SLC's Title IX office.

175.    Jane requested that the summary of her allegations be amended to include:

> Respondent had sexual contact and sexual intercourse with Reporting Individual without her affirmative consent in violation of Sarah Lawrence College's policy against Sexual Assault. Reporting Individual was incapable of providing affirmative consent due to complete incapacitation caused by severe intoxication. Reporting Individual believes the Respondent drugged the Reporting Individual, unknowingly to her, in order to sexually assault her. Reporting Individual's incapacitation was obvious and known to Respondent and all others who observed the Reporting Individual that night. Reporting Individual's degree of intoxication was so severe that she has no memory of the sexual contact or sexual intercourse that occurred during the sexual assault.

176.    Additionally, in the FIR, Investigator Nguyen reported that after Robert told Jane that he "still used a condom," Jane simply replied "great" and shut the door.

177.    Investigator Nguyen omitted numerous significant details Jane reported about this exchange.

178.    Jane requested that Dean Crandall clarify and amend the FIR as follows:

> He also asked Reporting Individual if she was on birth control. Reporting Individual stated she remembered being shocked that he asked such a private question but responded yes. Reporting Individual then shared Respondent told her he "still used a condom." *Reporting Individual became extremely distressed when the Respondent said this because she did not recall any sexual activity occurring between her and the Respondent the night before. In an effort to get the Respondent away from her as quickly as possible so she could process what he had just said and not become emotional in front of him, Reporting Individual stated "Ok, great" and shut the door.* She noted that the Respondent did not seem confused by their conversation. (emphasis added).

179.    By failing to include these details, the FIR was inaccurate and unfairly biased against Jane. The Title IX investigator withheld critical details that Jane actually reported and instead tailored her report in a manner which favored Robert.

180.    Instead of correcting the report's blatant errors, Dean Crandall informed Jane that she left the inaccuracies in the main report while relegating Jane's request for amendments to the very last appendix.

181.    This is not how the witnesses were treated when they requested changes to their statements. In those instances, Dean Crandall made the correction in the witness' actual statement.

182.    When Jane's counsel asked multiple times why the main report which contained these errors was not corrected, Dean Crandall refused to respond.

### The SLC Title IX Hearing Panel Interpreted Evidence in a Biased, Incomplete, and Prejudicial Manner

183.    SLC conducted the Title IX hearing on Wednesday, February 28, 2018, almost five months after Jane's initial report.

184.    SLC Policy states:

> The hearing coordinator will make reasonable efforts to schedule the hearing in a timely manner. Usually, the resolution of domestic violence, dating violence, sexual harassment, sexual assault and stalking complaints are completed within 60 days of the report. […] *Id.* at 179-180.

185.    Dean Crandall was appointed to conduct the hearing, advise the hearing panel, and write the decision letter despite being involved in the retaliation against Jane and requiring Jane to leave SLC.

186.    Not surprisingly, the hearing panel found Robert not responsible and issued a decision letter on March 5, 2018.

187.    The hearing panel's application of SLC policy and its evaluation of witness testimony was discriminatory towards and biased against Jane.

**The Hearing Panel Gave Witness Reports Little Weight Despite Every Witness Confirming that Jane's Degree of Intoxication was Severe to the Point of Incapacitation**

188.    During the investigation process, five witnesses, including multiple close friends of Robert who did not know Jane well or at all, were interviewed about the night of the sexual assault.

189.    These witness accounts were included in the FIR for the hearing panel and Dean Crandall to review.

190.    These witnesses observed Jane at the first party, which lasted about 30–45 minutes, and the second party, where Jane and Robert only stayed for about 15–20 minutes before leaving.

191.    All five witnesses concurred that Jane was exhibiting overt signs of incapacitation.

192.    The witnesses described Jane's level of intoxication prior to the sexual assault as "very drunk," "really drunk," "way too drunk," "super drunk," "a bit sloppy," and "very loose."

193.    The witnesses reasserted these observations during their testimony at the hearing.

194.    Each witness stated, based on their observations of Jane on the night of the assault, that anyone encountering her would have known that she was obviously intoxicated and incapacitated.

195.    Witness 4 explained that Jane was so intoxicated ("super drunk") that she felt uncomfortable around Jane and needed to remove herself from Jane's presence.

196.    Witness 3, Robert's prior roommate, reported that Jane was "past a normal drunk" and disclosed that he could tell she was "very intoxicated."

197.    Witness 1 reported that Jane was stumbling when walking both before and after the assault. She also reported that immediately after the assault, when Jane returned to her apartment, Jane was mumbling, slurring her words, and vomited from intoxication.

198.    Despite the clear consensus that Jane was blatantly, observably, and unequivocally incapacitated, the hearing panel found that Jane was not "too incapacitated" to consent. Instead, the panel accepted Robert's account as fact and disregarded all other evidence to the contrary.

**The Hearing Panel Misstated and Ignored Witness 1's Sober Eyewitness Account**

199.    Witness 1 observed Jane minutes before the sexual assault at Witness 1 and Jane's apartment.

200.    After Jane and Robert left the second party, they walked back to Jane and Witness 1's apartment before going to Robert's apartment where the sexual assault occurred.

201.    Witness 1 immediately knew that Jane was seriously incapacitated.

202.    Witness 1 described Jane as "very drunk."

203.    During the hearing, Witness 1 reported that Jane was slurring her words and stumbling.

204.    Witness 1 stated that after Jane left, Witness 1 became increasingly worried about Jane's level of intoxication.

205.    Witness 1 was so concerned about Jane that she texted her mother and asked if she should "go help" Jane. She explained that she was troubled because Jane was "way too drunk."

206.    Witness 1 also acknowledged that she was nervous about Jane being with Robert when Jane was so severely intoxicated because Robert was known to be "kinda aggressive."

207.    During the hearing, Witness 1 admitted that Robert had previously been sexually aggressive towards her. She reported that Robert made sexual demands of her and shoved her the same night he sexually assaulted Jane.

208.    Witness 1 also shared that she was aware of rumors around campus that Robert was drugging women to sexually assault them.

209.    Witness 1 stated that Robert acknowledged these rumors when speaking to her.

210.    Witness 1 also observed Jane immediately after the assault when Jane returned to their apartment approximately thirty minutes after she first visited the apartment.

211.    Witness 1 reported that Jane "stumbled into the room" and was "mumbling" "her words. Witness 1 reported that Jane needed to lie down and Witness 1 had to get a trash can for Jane to vomit in.

212.    Witness 1 explained that Jane was mumbling and speaking very quietly when she stated, "I think [Robert] and I just had sex, he hurt me."

213.    Witness 1 reported that she told Jane that Robert "took advantage" of her and helped her get to bed.

214.    Witness 1 felt that it was necessary to make sure Jane was lying on her side in case she vomited in her sleep.

215.    The morning after the assault, Witness 1 observed that Jane had no memory of the previous night.

216.    She stated that Jane seemed "shocked and confused" and "couldn't remember anything."

217.    Witness 1 told the hearing panel that she believed that Robert raped Jane stating, "I just know from the rules of consent that you can't give consent if you're drunk."

218.    The hearing panel's rationale for their decision completely misstated Witness 1's statement and testimony in order to find for Robert and hold that a sexual assault did not occur on SLC's campus.

219.    The hearing panel completely failed to mention Robert's reputation for being sexually aggressive towards women and multiple rumors around campus that he repeatedly drugged women or got them drunk in order to take advantage of them sexually.

220.    The panel failed to question Witness 1, other witnesses, or Robert regarding these rumors. Instead, the panel simply ignored this and stated that there was "no evidence" that Robert drugged Jane.

221.    Additionally, the panel mischaracterized Witness 1's report of what occurred after the sexual assault by making it seem that Jane simply returned to her room, chatted with Witness 1 about having sex, and commented about the size of Robert's penis.

222.    In a biased manner, the hearing panel completely misstated Witness 1's testimony and instead accepted as fact Robert's claim that Jane was able to walk without stumbling.

223.    The hearing panel not only failed to credit witness statements in a fair and impartial manner but also completely refused to consider Jane's blacked out state.

224.    Witness 1 confirmed that Jane was exhibiting signs of incapacitation when she reported that Jane was mumbling, slurring her words, and stumbling.

225.    Additionally, a video Jane supplied to Investigator Nguyen, which revealed that Jane was unable to remain upright and had a blank, heavily intoxicated stare in her glazed eyes shortly before the sexual assault occurred, was completely ignored by the panel.

226.    In fact, Jane's lack of memory was not addressed once in the hearing panel's decision.

227.    Forensic psychiatrist Dr. Edgar P. Nace [hereinafter Dr. Nace"], who was retained by Jane, carefully reviewed the record including images and videos of the night in question and concluded that Jane was incapacitated.

228.    Dr. Nace stated, "[i]n my medical opinion, it is likely that Ms. [Jane] was incapacitated at the time of the sexual encounter."

229.    Dr. Nace explained,

> [Jane] had symptoms compatible with a high blood alcohol level, such as slurring of speech, unsteady gait, and amnesia (blackout). Further, she began drinking at 10:30 pm, without recent food ingestion, and was not used to drinking the quantity of alcohol described. She does recall a different or unusual reaction to what was ingested. When looked at as a whole, both the symptoms experienced, her unusual reaction, and circumstances of her drinking (lack of food, greater quantity of alcohol) point to incapacitation rather than intoxication.

230.    In his report, Dr. Nace discussed scientific literature which studied and found that alcohol induced blackouts typically occur at a blood alcohol content [hereinafter "BAC"] of 0.20% to 0.25%.

231.    Given this, Dr. Nace found "[a]lthough a BAC was not available on [Jane], the symptoms she exhibited and the experience she reported (i.e., lack of memory for the sexual encounter) are in line with an alcohol induced blackout, which with reasonable medical probability, renders one incapacitated."

232.    Instead of accurately evaluating and weighing the evidence, the panel prejudicially adopted Robert's narrative completely and repeatedly refused to consider the dispositive and unrebutted evidence against him.

**The Hearing Panel Refused to Consider Robert's Repeated Admissions**

233.    Robert stated multiple times during the investigation and hearing that he was aware that Jane was drunk when he engaged in sexual contact and intercourse with her.

234.    In fact, the last sentence of Robert's closing statement started with, "Yes, I knew Jane was drunk."

235.    In his written statement to the Title IX Investigator, Robert wrote, "[w]e were both drunk that night."

236.    Additionally, when asked whether he was aware that Jane was intoxicated after they left the second party and were returning to Hill House, Robert stated, "yea, we were both drunk (…)" and "I mean we were both drunk, yes."

237.    The panel did not acknowledge Robert's repeated admission that he knew Jane was intoxicated that night.

238.    The panel failed to do so despite the fact that Robert's admission, along with every other witness report that Jane exhibited readily observable signs of incapacitation, constituted ample evidence to conclude that Robert should have known that Jane was unable to provide affirmative consent.

**The Hearing Panel Refused to Apply the Preponderance of the Evidence Standard in Order to Find in Favor of Robert**

239.    Witness reports and Robert's admissions, combined with Jane's report that she blacked out, strongly indicated by the preponderance of the evidence that Jane was obviously and observably incapacitated and that any reasonable person would have known that she was incapable of giving knowing, voluntary, and affirmative consent.

240.    Instead of reviewing this evidence in an impartial manner, the panel ignored all evidence contrary to Robert's account and assigned him complete and unilateral credibility.

241.    The panel erroneously found that Jane had no trouble walking when Witness 1 clearly reported she was stumbling.

242.    The panel erroneously found that Jane was not "too incapacitated" when every witness report confirmed she was indeed significantly incapacitated.

243.    The panel erroneously found that Robert did not drug Jane despite testimony to the contrary and Jane's observed blacked-out state.

244.    The hearing panel's clear bias and failure to apply the correct standard required by SLC policy was prejudicial against Jane and violated Title IX.

245.    There is an entire section addressing affirmative consent in SLC Policy.

246.    SLC Policy requires "affirmative consent" at all times and defines it as a "knowing, voluntary, and mutual decision among all participants to engage in sexual activity."[2]

247.    Under SLC Policy, consent is "required regardless of whether the person initiating the act is under the influence of drugs and/or alcohol."[3]

248.    Further, and most importantly, SLC policy explains "[c]onsent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly chose to participate in sexual activity."[4]

249.    SLC Policy makes clear, "[d]epending on the degree of intoxication, someone who is under the influence of alcohol, drugs, or other intoxicants may be incapacitated and therefore unable to consent."[5]

250.    The Student Handbook is distributed and made available to all students. Therefore, Jane expected to be protected by this policy.

---

[2] *See SLC Student Handbook*, pg. 161 at https://www.sarahlawrence.edu/media/student-life/pdf/SLC-Student-Handbook.pdf.
[3] *Id*.
[4] *Id*.
[5] *Id*.

251.    In the decision letter, Dean Crandall and the hearing panel completely failed to address affirmative consent at all.

252.    Rather, they found that "they did not believe that reporting individual [Jane] was too incapacitated to give consent" with no mention of *affirmative* consent.

253.    During the hearing, Robert stated that he believed "consent" was provided because Jane did not stop him.

254.    Robert's disturbing admission was not mentioned or referenced once in the hearing panel's decision despite the fact that SLC policy made clear that "silence or lack of resistance" does not demonstrate consent.

255.    This entire proceeding was biased against Jane. The panel failed to apply the correct standard of evidence, consider the multi-factors of affirmative consent required in SLC policy, or state why they believed it was provided.

**The Hearing Panel Incorrectly Applied SLC Policy Regarding Incapacitation which Resulted in a Biased Finding in Favor of Robert**

256.    SLC Policy stated, "[c]onsent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly chose to participate in sexual activity."

257.    However, in the decision letter, Dean Crandall proclaimed that the hearing panel did not believe that [Jane] was *too* incapacitated to be able to give consent.

258.    Nowhere in SLC policy does it state that a student who is beyond incapacitation can still provide affirmative consent; instead it clearly stated that incapacitation alone is sufficient.

259.    The panel demonstrated clear bias and as a result found in favor of Robert by applying a more stringent requirement that not only did Jane have to be incapacitated, but her incapacitation had to have been so extreme that she was unable to walk.

260.    On March 12, 2018, Jane appealed the hearing panel's decision.

261.    Jane was not given a timeframe regarding when to expect an appeal decision.

262.    Additionally, while Jane was provided the identity of the Chair of the Appeal Committee, Dean Kanwal Singh [hereinafter Dean Singh], she was not informed of the identities of the appeal committee members nor was she given an opportunity to object to any potential conflicts of interest.

263.    Initially, Dean Crandall told Jane that she would not be permitted to review the alleged perpetrator's response to her appeal if he chose to submit one even though he was permitted to review her appeal.

264.    When Jane's legal counsel objected to this, pointing out the clear bias, SLC agreed to allow Jane to review the alleged perpetrator's response if he chose to submit one.

265.    On March 29, Dean Crandall informed Jane that the alleged perpetrator did not submit a response.

266.    On April 6, 2018, Dean Singh issued a decision remanding the case to a different hearing panel for a new hearing. Dean Singh wrote:

> The Committee finds evidence that the preponderance of the evidence standard may not have been appropriately applied. The Committee questions the hearing panel's rationale: "The panel believed that while both parties drank alcohol that evening; they did not believe the reporting individual was too incapacitated to be able to give consent." The Appeal Committee questions the phrase "too incapacitated" and feels that a person can be incapacitated, and therefore unable to give affirmative consent, nor not incapacitated. (See p. 157 of the Student Handbook, part D of "Affirmative Consent.") A determination of being "too incapacitated", however, does not make sense. The Committee believes that this

determination may be indicative of an inappropriate application of the preponderance of evidence standard.

Secondarily, the Committee suggests that although the use of "consent" by the hearing panel implies "affirmative consent", the distinction should be made clear. This, however, is not the basis for the decision, but a suggestion for the sake of clarity.

267.    On April 10, 2018, Jane received an email stating that a new hearing would be scheduled.

268.    On April 13, 2018, Jane received notice that the hearing would occur on April 28, 2018 at 6:30pm.

269.    On April 20, Jane was informed that the hearing was postponed indefinitely due to Robert's "medical issue."

270.    When Jane requested a timeframe for when a hearing may be expected, Dean Crandall failed to respond.

271.    The second hearing occurred on June 6, 2018.

272.    The second hearing panel decision letter was issued on June 11, 2018.

273.    The second hearing panel again found Robert "not responsible."

274.    The second hearing panel again accepted Robert's statements as fact and ignored the overwhelming evidence, including multiple witness reports, to the contrary.

275.    The second hearing panel again acted with significant bias against Jane.

276.    Jane appealed the second hearing panel's decision.

277.    The appeal of the second hearing panel's decision was rejected on July 9, 2018.

**SLC'S History of Inadequately Addressing Sexual Assault**

278.    On October 30, 2013, four years prior to Jane's October 7, 2017 report, an SLC student filed a discrimination complaint against SLC with the United States Department of Education Office for Civil Rights [Attachment 1].

279.    In her complaint, the student alleged that she was sexually assaulted in her dorm room by a stranger.

280.    In her complaint, the student alleged that the person who sexually assaulted her was permitted to remain on campus and that a no contact order was not enforced by SLC.

281.    The student also reported that she was subjected to extensive retaliation by other SLC students, staff, and administrators.

282.    The student complained that the director of security placed an unfair burden on her to find other victims in order to substantiate her claim against her assailant.

283.    The student related that Paige Crandall blamed her for violating the no contact order and refused to assist other women on campus who were upset by the situation.

284.    The student explained that SLC investigators required her to provide documentation to substantiate her sexual assault including obtaining police reports and documents from the District Attorney.

285.    SLC's president retaliated by blaming the victim and her supporters for perpetrating vigilantism.

286.    Administrators also told the victim that she needed to be quiet and unfavorably compared her behavior to that of her assailant who was "keeping a low profile."

287.    On December 3, 2013, OCR found the allegations appropriate for investigation and began an investigation of SLC.

288.    After a 4.5-year investigation, OCR and SLC entered into a resolution agreement on April 6, 2018.

289.    Although OCR found that there was "insufficient evidence to substantiate the Complainant's allegations of noncompliance with Title IX," it did find that SLC had inadequate "procedural compliance" with Title IX.

290.    As part of the Resolution Agreement, SLC was required to draft proposed revised grievance procedures which include "specific, designated and reasonably prompt timeframes for the major stages of the grievance process, including the investigation, complaint resolution, and appeal processes."

291.    As part of the Resolution Agreement, SLC was required to "provide training to its Title IX coordinator, his designees, and any other College officials, administrators, faculty, staff or students directly involved in receiving, processing, investigating, adjudicating and/or resolving complaints of sexual harassment, including sexual assault/violence (the "Implementing Individuals"), on the College's revised Title IX grievance procedures."

292.    As part of the Resolution Agreement, SLC was required to "provide training to the Implementing Individuals, in addition to training the College regularly has provided, on the College's obligations regarding the investigation of complaints; information on consent and the role drugs and alcohol can play in the ability to consent; the importance of accountability for individuals found to have committed sexual violence; how to determine credibility; how to evaluate evidence and weigh it in an impartial manner; how to handle confidentiality issues; the effects of trauma; cultural awareness training regarding how sexual assault/violence may impact students differently depending on their backgrounds; how to assess hostile environment; and, Title IX's prohibitions on retaliation."

293.    As part of the Resolution Agreement, SLC was required to, "with respect to those Implementing Individuals responsible for the investigations into complaints and allegations of

misconduct, the training will include, in addition to the training the College regularly has provided, instruction on how to conduct adequate, reliable and impartial Title IX investigations for those charged with investigative duties, including how to handle incidents that occur off campus; information on working with and interviewing persons subjected to sexual violence; information on particular types of conduct that would constitute sexual violence, including same-sex sexual violence; and, information about coordination and communication between the College and the City of Yonkers Police Department, particularly with respect to suspending investigations. Consistent with training previously provided by the College, the training will also include information regarding the provision of interim measures and the need for remedial actions for the respondent, complainant, and school community, and will stress fully documenting all steps of an investigation and resolution, like testimony collected from witnesses, the start and stop dates of any investigation suspension, the offer and acceptance/decline of interim relief, and the issuance of notice to any party."

294.    Finally, as part of the Resolution Agreement, SLC was required to "ensure that it appropriately and completely documents investigations. The College will maintain the following documentation, at minimum:

    1.    if provided by a reporting party, the name and sex of the alleged victim, and if different, the name and sex of the person reporting the incident;

    2.    if provided by a reporting party, a description of the incident(s), and the date(s) and time(s) (if known) of the alleged incident(s);

    3.    the date that the complaint or other report was made to the College;

    4.    if provided by a reporting party, the names and sex of all persons alleged to have committed the alleged conduct;

    5.    if provided by a reporting party, the names and sex of all known witnesses to the alleged incident(s);

    6.    all requests for, offers of and implementation of interim steps with respect to the complainant and the respondent;

    7.    whether the parties were notified that retaliation was prohibited;

    8.    the dates that the complainant, respondent and all witnesses were interviewed and all interview notes;

9.      any relevant documentary evidence (including medical, cell phone and other records as appropriate), and the date(s) on which each was obtained;

10.     any written statements of the complainant (or alleged victim, if different from the complainant), the respondent, and any other witnesses;

11.     if applicable, the date on which the College temporarily suspended the fact-finding aspect of its Title IX investigation while any law enforcement agency was in the process of gathering evidence, and as applicable, the date on which the College resumed its investigative process;

12.     if applicable, where an investigation was not initiated or was initiated, but not completed, the reason for not conducting or completing an investigation, and an assessment of the situation and what actions the College must take, if any, to discharge its obligations under Title IX;

13.     the outcome of the investigation, and if any, the disciplinary process, and the dates that the parties were notified of these outcomes; and

14.     whether there were any appeals, the outcome of the appeals, and the dates that the parties were notified of the outcome of any appeals.

295.    In its letter to SLC's president outlining the Resolution Agreement, OCR explained that as a recipient of federal financial assistance, SLC must ensure that Title IX was properly implemented.

296.    OCR admonished SLC that "when responding to alleged sexual harassment, a recipient must take immediate and appropriate action to investigate or otherwise determine what occurred. If an investigation reveals that discriminatory harassment has occurred, a recipient must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring. Pending the outcome of an investigation, Title IX requires a recipient to take steps to avoid further harassment as necessary, including taking interim steps before the final outcome of the investigation. The recipient should undertake these steps promptly once it has notice of a sexual harassment allegation. Interim measures are individualized services offered as appropriate to either or both parties involved in the alleged incident of sexual misconduct, prior to an investigation or while an investigation is pending. Interim measures include counseling, extensions of time or other course-related adjustments, modifications of work or class schedules, campus escort services, restrictions on contact between the parties,

changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of campus, and other similar accommodations."

297.    OCR specifically found that pursuant to SLC's 2015-2016 Policy on Sexual Harassment, Sexual Assault, Domestic Violence, Dating Violence and Stalking, "upon receipt of a report or complaint, Director 1 or his designee will conduct an investigation of any report or complaint, **whether or not a formal complaint was filed**; and, the investigation would include obtaining written statements from the parties and witnesses, conducting interviews of the respondent, complainant, and relevant witnesses; and, considering evidence from any other sources the investigator deems appropriate. Following the investigation, the matter is referred for a hearing when a formal complaint is filed; or, **if no formal complaint is filed, the matter is referred to the Title IX Coordinator, who determines whether further action is warranted**." (emphasis added)

298.    Since "there are no timeframes for the matter to go to the Hearing Committee, for the Hearing Committee to conduct its hearing and render a decision, or for the Appeal Committee to review the Hearing Committee's determination…. OCR determined that the College has not adopted grievance procedures that provide for the prompt and equitable resolution of complaints of sexual harassment and assault/violence, as required by the regulation implementing Title IX, at 34 C.F.R. § 106.8(b)."

## SLC'S HISTORY OF ALLOWING A FIFTY-YEAR-OLD EX-CONVICT TO CREATE A CULT IN CAMPUS HOUSING WHICH PREYED ON YOUNG WOMEN

299.    In September 2010, a 50-year-old ex-convict named Larry Ray began residing in an SLC dorm in the middle of campus, Slonim Woods 9.

300.    According to an extensive article in New York Magazine, Ray installed himself in the dorm's common area, cooking steak dinners and ordering expensive delivery for the young women who lived in the unit. New York Magazine, *The Stolen Kids of Sarah Lawrence,* April 29, 2019 http://nymag.com/intelligencer/2019/04/larry-ray-sarah-lawrence-students.html

301.    Like a cult leader, Ray continued to live in the SLC dorm until the summer of 2011 exploiting and manipulating the young women who lived there. *Id*.

302.    When one of the parents discovered that a 50-year-old man was living in SLC student housing with their 19-year-old daughter, they met with Dean Green to discuss their concerns. *Id*.

303.    Dean Green told them he had received other complaints about Ray but brushed their concerns aside. *Id*.

304.    A second meeting with Dean Green ended the same way. *Id*.

305.    Ultimately, one of the young women who was brainwashed into the SLC campus-based sex cult sent a long email to Dean Green with the subject line "The Truth."

306.    In this email, the student informed Dean Green that when Ray first moved into Slonim 9 she had expressed "fears and concerns about Larry Ray being a bad, dangerous, manipulative, and sexually deviant man." *Id*.

307.    When this student graduated from SLC, Dean Green approached her mother and father and said of Ray, "Well, I'm glad I won't be seeing him anymore." *Id*.

## LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF:
### SEX DISCRIMINATION IN VIOLATION OF TITLE IX 20 U.S.C. 1681
### AGAINST SARAH LAWRENCE COLLEGE
### (Clearly Unreasonable Response)

308.    Jane repeats and re-alleges all prior paragraphs.

309.    Upon information and belief, SLC receives federal financial assistance.

310.    Jane sustained harassment because of her sex that was so severe, pervasive and/or objectively offensive that it deprived her of access to educational opportunities.

311.    The harassment Jane endured was subject to SLC's control and SLC could have taken remedial action.

312.    SLC employees with authority to address the alleged discrimination and institute corrective measures had actual knowledge of the harassment sustained by Jane and failed to adequately respond.

313.    SLC's response to the harassment Jane endured and SLC's lack of response was deliberately indifferent, insofar as the response or lack thereof was clearly unreasonable in light of the known circumstances.

314.    The inadequacy or nonexistence of any investigation by SLC into Jane's reported rape constitutes and is part of a pattern and practice of deliberate indifference with respect to the duties and the protections owed to female students under Title IX.

315.    Although SLC was on notice of other instances of sexual assault and sex-based violence perpetrated against SLC's female students, its failure to take action to adequately address those incidents created a climate in which such misconduct against women was tolerated. As a result, SLC's policy of deliberate indifference to the safety and security of its female students encouraged sexual assault and gender-based violence.

316.    As a result of SLC's action and/or lack of action, Jane has suffered damages.

**SECOND CLAIM FOR RELIEF:**
**SEX DISCRIMINATION IN VIOLATION OF TITLE IX 20 U.S.C. 1681**
**AGAINST SARAH LAWRENCE COLLEGE**
**(Hostile Environment)**

317.    Jane repeats and re-alleges all prior paragraphs.

318.    Jane was forced to endure a hostile environment because of her sex.

319.    The environment at SLC was hostile and abusive towards Jane.

320.    The environment at SLC was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe and pervasive as to alter the conditions of Jane's educational environment.

321.     As a result of SLC's action and/or lack of action, Jane has suffered damages.

### THIRD CLAIM FOR RELIEF:
### RETALIATION IN VIOLATION OF TITLE IX 20 U.S.C. 1681
### AGAINST SARAH LAWRENCE COLLEGE

322.    Jane repeats and re-alleges all prior paragraphs.

323.    Jane engaged in Title IX protected activities when she reported that she was sexually assaulted to SLC.

324.    SLC had knowledge that Jane engaged in protected activity.

325.    Jane's engagement in protected activity was closely followed by adverse action, treatment, and conditions by SLC.

326.    There was a causal connection between Jane's protected activity and SLC's adverse action, treatment, and conditions against Jane.

327.    A retaliatory motive played a part in the adverse actions toward Jane.

328.    As a result of SLC's adverse action, Jane has suffered damages.

### FOURTH CLAIM FOR RELIEF:
### BREACH OF CONTRACT
### AGAINST SARAH LAWRENCE COLLEGE

329.    Jane repeats and re-alleges all prior paragraphs.

330.    An implied contract was formed when SLC accepted Jane for enrollment.

331.    The terms of the implied contract were contained in SLC's Policy.

332.    Implicit in this contract was the requirement that SLC act in good faith in dealing with its students.

333.    Jane fulfilled her end of the bargain by paying the required tuition, charges and fees, satisfying the academic requirements, and complying with SLC's procedures.

334.    SLC breached its implied duty of good faith by failing to timely investigate Jane's complaint of sexual assault, mishandling the investigation once it was started, and taking retaliatory action against Jane for reporting sexual assault on SLC's campus.

335.     SLC refused to provide accommodations, award even partial academic credit as required by the SLC handbook, and failed to reimburse tuition, charges and fees.

336.    As a result of SLC's action, Jane has suffered damages.

## FIFTH CLAIM FOR RELIEF:
## NEGLIGENCE
## AGAINST ALL DEFENDANTS

337.    Jane repeats and re-alleges all prior paragraphs.

338.    Defendants breached their duty of care owed to Jane.

339.    The duty of care owed to Jane is outlined in Article 129-B of NY CLS Educ Law.

340.    Defendants had a duty to hire competent personnel, adequately train its personnel annually, adequately supervise its personnel, and terminate or sanction personnel for inadequate performance.

341.    Defendants owed a duty of care to Jane to ensure that its staff and personnel were properly trained and supervised.

342.    Defendants breached these duties of care and were negligent in their screening, hiring, training, supervision, disciplining, and retaining as follows:

        a.      Failing to promptly and thoroughly investigate and adjudicate complaints of sexual misconduct;

b.     Failing to properly notify and train employees, agents, representatives, and students concerning their obligations under Title IX and Article 129-B of the New York Education Law (N.Y. Educ. Law 6443 et. seq.);

c.     Failing to discover and preserve evidence;

d.     Failing to prevent and remediate retaliation because a student engaged in protected activity;

e.     Failing to provide proper interim measures and accommodations to a student who engaged in protected activity;

f.     Failing to ensure that complaints of sexual assault are adequately investigated, and fairly and timely adjudicated;

g.     Failing to ensure that students, staff, administrators, employees, agents, and representative are not engaging in retaliation forbidden by Title IX;

h.     Continuing to employ unqualified employees, including investigators, hearing panel advisors, and hearing panel members.

343.    At all times relevant to the allegations contained in this complaint, Defendants knew, or in the exercise of reasonable care should have known, that its agents and employees were inadequately trained, lacked the requisite skill, and were not suited to conduct investigations and adjudication of claims of sexual assault in a campus setting;

344.    As a direct and proximate result of Defendants' negligence, Jane suffered damages.

**SIXTH CLAIM FOR RELIEF:**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**AGAINST ALL DEFENDANTS**

345.    Jane repeats and re-alleges all prior paragraphs;

346.    Defendants owed a duty of care to Jane;

347.    Defendants knew that Jane engaged in protected activity by reporting a sexual assault on SLC's campus;

348.    Despite their obligations under federal and New York state law and SLC Policy, Defendants failed to take prompt action to provide protective measures for Jane which unreasonably endangered her physical safety and caused her to fear for her own safety.

349.    Due to Defendants' negligence, Jane was forced to live in the same building as her assailant and lived in daily fear of encountering him every day;

350.    Defendant's actions were extreme and outrageous;

351.    Jane suffered severe emotional harm as a result of the Defendants' breach of their duties.

### SEVENTH CLAIM FOR RELIEF:
### RESPONDEAT SUPERIOR

352.    Jane repeats and re-alleges all prior paragraphs;

353.    The individual Defendants, Cristle Collins Judd, Allen Green, Daniel Trujillo, Paige Crandall, and Beverly Fox were agents, employees, representatives, and servants of the non-individual defendant, Sarah Lawrence College.

354.    As a result, the non-individual defendant, Sarah Lawrence College, is responsible for the improper actions and conduct of it agents, employees, representatives, members, visitors, and servants, who are individual defendants, under the doctrine of vicarious liability.

### RELIEF REQUESTED

WHEREFORE, Plaintiff requests judgment in favor of the Plaintiff and against Defendants individually, jointly, and severally, as follows:

355.    Awarding Plaintiff compensatory damages in an amount to be proven at trial;

356.    Awarding punitive damages in an amount to be proven at trial;

357.    Awarding prejudgment interest;

358.    Awarding reasonable attorney's fees, costs, and disbursements expended in

litigating this matter; and

359.    Any such other relief as the Court deems just and proper.

## **JURY DEMAND**

360.    Plaintiff demands trial by jury.

DATED: October 29, 2019

_____/s/_____
James R. Marsh, Esq.
**MARSH LAW FIRM PLLC**
151 East Post Road, Suite 102
White Plains, New York 10601-5210
Phone: 212-372-3030
Fax: 833-210-3336
Email: jamesmarsh@marsh.law

_____/s/_____
Gina. M. Decrescenzo, Esq.
**GINA DECRESCENZO, P.C.**
180 South Broadway, Suite 302
White Plains, New York 10605
Phone: 914-615-9177
Fax: 914-615-9176
Email: gina@decrescenzolaw.com
